# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BERISH BERGER, et al.,    :
    Plaintiff,    :    CIVIL ACTION
        :
    v.    :
        :
RICHARD ZEGHIBE, et al.,    :    No. 08-5861
    Defendants.    :

## MEMORANDUM

Schiller, J.                                        October 6, 2010

    Defendant Mark Sahaya seeks to vacate or amend the Amended Civil Judgment entered against him on August 5, 2010, following a two-week jury trial. The evidence against Sahaya included testimony and exhibits regarding his role in: (1) a December 6, 2006 meeting between Defendants and Plaintiff Berish Berger; and (2) creating and sending two "Letters of Intent" which Berger received in January 2007. Presently before the Court is Defendant Mark Sahaya's Post-Trial Motion to Alter or Amend the Judgment and in the Alternative, for a New Trial. Sahaya's Motion will be denied for the reasons discussed below.

## I. BACKGROUND

    This case arises from an unmemorialized investment relationship between Berish Berger, corporate entities associated with him (collectively, the "Berger Plaintiffs"), and Defendants including Sahaya. The Berger Plaintiffs identified Sahaya as a member of a conspiracy to defraud Berger via "deceitful transactions in Philadelphia real estate." (Compl. ¶ 1.) According to Berger, Sahaya and his co-defendants obtained $36.5 million from the Berger Plaintiffs by inducing Berger to invest in two properties in Philadelphia: a parcel of land between JFK Boulevard and the

Schuylkill River (the "River City Properties") and a five-story office building located at 2040 Market Street.

Sahaya acted as a liaison between co-defendants Eli Weinstein and Ravinder Chawla. (Trial Tr. 67, July 26, 2010; Trial Tr. 86-87, July 28, 2010.) At Weinstein's request, Sahaya arranged a December 6, 2006 meeting at which architect James Rappoport gave a presentation to pitch investment in the River City Properties to Berger. (Trial Tr. 66-67, July 26, 2010.) Weinstein, Sahaya, and Chawla were all present at this meeting. (*Id*.) Sahaya had a financial incentive to secure Berger's investment in the River City Properties as the "broker" or "facilitator" of the deal, although he did not actively participate in the meeting with Berger. (Trial Tr. 38, 52, July 22, 2010; Trial Tr. 69-70, July 26, 2010.) Rappoport's presentation depicted the River City Properties as a large high-rise development featuring skyscrapers fifty to sixty stories tall. (Trial Tr. 53, July 26, 2010.) No one present told Berger that the Philadelphia City Council was about to adopt an ordinance which would restrict building height on the land to 125 feet, rendering Rappoport's plan impossible to fulfill. (*Id*. at 71-72.)

Berger also became interested in the 2040 Market Street project at the December 6, 2006 meeting. (*Id*. at 78.) This project involved selling the air rights above the existing five-story structure. (*Id*. at 100, 135.) Approximately one week after the December 6 meeting, Sahaya prepared a letter expressing the interest of "Ram Associates" in purchasing the air rights at the 2040 Market Street site for $28 million. Sahaya prepared the letter in Chawla's office, using one of Chawla's computers. (Trial Tr. 125, July 20, 2010.) The letter was dated July 21, 2006. (Trial Tr. 91, 93-95, July 19, 2010.)

Sahaya then prepared a second "Ram Associates" letter, dated December 21, 2006, in which

2

the purported buyer increased its offer to $31 million. (Berger Pls.' Tr. Ex. 18.) Sahaya had the letter faxed "to the United Kingdom" and directed Chawla and his co-workers to "make sure you remove the fax trailer before you do so!!!" in a December 14, 2006 e-mail. (Trial Tr. 97, July 19, 2010; Berger Pls.' Tr. Ex. 116.) Berger, who resides in the United Kingdom, received this follow-up letter in early January. (Trial Tr. 55, July 22, 2010.) Berger learned later that the purported air rights purchaser was a fabrication. (*Id*. at 56.) Sahaya ultimately received over $600,000 of the Berger Plaintiffs' money from Weinstein for his services. (Trial Tr. 68, July 26, 2010.)

The jury found Sahaya liable for fraud and conspiracy, but found him 0% liable for compensatory damages. However, the jury directed Sahaya to pay the Berger Plaintiffs $100,000 in punitive damages. The Court entered judgment against Sahaya accordingly.

Sahaya now moves for judgment notwithstanding the verdict under Federal Rule of Civil Procedure 59. In the alternative, Sahaya argues that the Court must grant a new trial under Rule 59(a) to prevent injustice and correct a verdict that is "against the great weight of evidence." (Def. Mark Sahaya's Post-Trial Mot. to Alter or Amend the J. and in the Alternative, for a New Trial [Sahaya Mot.] 12.)

## II. STANDARD OF REVIEW

A motion to alter or amend a judgment under Rule 59(e) "must rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." *ConsulNet Computing, Inc. v. Moore*, Civ. A. No. 04-3485, 2008 WL 2950783, at *1 (E.D. Pa. July 30, 2008) (quoting *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).

Sahaya relies on the third ground. The question before the Court is thus "whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 259 (3d Cir. 1987). The Court is not free to weigh the evidence, pass on the credibility of witnesses, or substitute its judgement of the facts for that of the jury. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). Rather, the Court "must determine whether a reasonable jury could have found for the prevailing party." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 (3d Cir. 1995).

Sahaya moves in the alternative for a new trial under Rule 59(a). Courts may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). A trial court's discretion is limited when a party moves for a new trial because the verdict is against the clear weight of the evidence. To be overturned, the verdict must be "contrary to the great weight of the evidence; that is, where a miscarriage of justice would result if the verdict were to stand." *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001) (internal quotation marks omitted). A new trial should be granted for this reason only "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 309 n.18 (3d. Cir. 2007).

## III. DISCUSSION

Sahaya's motion for judgment notwithstanding the verdict asserts that: (1) the jury's fraud and civil conspiracy verdicts against Sahaya are not supported by the evidence; (2) the jury's finding of 0% liability as to Sahaya warrants amending the judgment; and (3) the jury's punitive damages

award against Sahaya is unjustified. In the alternative, Sahaya requests a new trial to prevent a "miscarriage of justice." (Sahaya Mot. at 11.) The Court will examine each point in turn.

### A. The Jury Could Reasonably Conclude That Sahaya Committed Fraud

Sahaya argues that the Berger Plaintiffs "failed to satisfy all elements of fraud as to Defendant Sahaya." (*Id.* at 2.) Establishing fraud in Pennsylvania requires a showing of: (1) a misrepresentation of a material fact; (2) scienter; (3) the defendant's intent to induce the plaintiff's action; (4) justifiable reliance by the defrauded party upon the misrepresentation; and (5) that this reliance was a factual cause of the harm suffered by the plaintiff. *Colaizzi v. Beck*, 895 A.2d 36, 39 (Pa. Super. Ct. 2006). Specifically, Sahaya argues that Berger failed to show that: (1) Sahaya made any misrepresentations to him; (2) any such misrepresentations were material; or (3) Berger relied on Sahaya's misrepresentations. (Sahaya Mot. 2-5.) The jury in this case considered evidence which could reasonably satisfy each of these elements as to Sahaya.

#### 1. *Sahaya's Misrepresenations to Berger*

Under Pennsylvania law, a misrepresentation may be either "concealment of a material fact" or "an intentional false statement." *Donahue v. Workers' Comp. Appeal Bd.*, 856 A.2d 230, 236 n.14 (Pa. Commw. Ct. 2004). Sahaya asserts that he made no misrepresentations to Berger because neither knew of the other's role in the transaction. (Sahaya Mot. 2-3.) Sahaya accurately notes that Berger did not know Sahaya and that Sahaya did not speak with him during the December 6, 2006 meeting. (Trial Tr. 38, July 22, 2010.) These facts, however, do not foreclose a jury finding that Sahaya defrauded Berger.

The jury heard testimony that Sahaya arranged the December 6, 2006 meeting at which Defendants marketed both the River City Properties and the 2040 Market Street deals to Berger.

5

(Trial Tr. 69-72, 78, July 26, 2010.) Sahaya attended the presentation and followed up with the letters from "Ram Associates" (the "Ram Letters") shortly thereafter. (Trial Tr. 97, July 19, 2010; Berger Pls.' Tr. Ex. 116.) Sahaya maintains that he prepared the Ram Letters to create a "straw buyer" to protect the identity of "an interested, but uncommitted, potential buyer" and to preserve his commission on the deal by keeping this buyer from dealing with Weinstein. (Sahaya Mot. 6.) Significantly, this explanation does not address Sahaya's backdating and postdating the letters. In any event, it is reasonable to conclude, as did the jury, that the Ram Letters were intended to mislead Berger into thinking that the air rights above the 2040 Market Street site were more valuable than they actually were. Sahaya thus made misrepresentations to Berger.

2.  *Sahaya's Misrepresentations Were Material*

Sahaya argues that the Ram Letters were not material because Berger did not see the letters "until sometime in mid-January 2007, long after he sent millions of dollars to Weinstein for the 2040 site." The jury reasonably concluded otherwise.

A misrepresentation is material if its target would not have entered into the agreement but for the misrepresentation. *Elgen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1186 (Pa. Super. Ct. 2005). As Sahaya notes, Berger sent Defendants $15 million between January 8 and January 18, 2007. (Sahaya Mot. 4.) Berger had already sent $21.5 million on December 18, 2006, to invest in both the River City Properties and 2040 Market Street. (*Id*. at 3-4.) However, it was not unreasonable for the jury to conclude that Berger would not have invested an additional $15 million had he not seen the Ram Letters and their representations as to the site's value. Berger also received the letters around the same time that Weinstein visited Berger in his home to pressure him for more money, including for the 2040 Market Street project. (Trial Tr. 40-41, July 22, 2010.) The

6

letters thus came at a time when Berger's continued participation in the scheme appeared to hang in the balance. Taken together, the evidence supports the jury's verdict on this point.

        3.    *Berger's Reliance*

Sahaya argues that the timing of and disclaimers in the Ram Letters prevented Berger from relying on them. Sahaya's argument with respect to the timing of the letters is identical to his argument that the letters were not material. In addition, Sahaya contends that the disclaimers in the Ram Letters put Berger on notice that the letters could not be relied upon as firm offers and thus could not have been material to his decision to invest. (Sahaya Mot. 5.) Nevertheless, a reasonable jury could conclude that Berger relied on the Ram Letters as he made his decision to continue to invest. The firmness of the offer was irrelevant to Berger; the "offer" was not, after all, directed at him. Rather, Berger relied on the letters as evidence that a bona fide purchaser had made — and increased — a multimillion dollar offer for the air rights at the 2040 Market Street site. His reliance on the letters as an indication of the site's value is sufficient to support the jury's fraud verdict as to Sahaya.

**B.    The Jury Reasonably Concluded That Sahaya is Liable for Civil Conspiracy**

Sahaya challenges the jury's conclusion that he is liable for civil conspiracy, asserting that "Plaintiffs presented no evidence to support the claim that Defendant Sahaya acted with a common purpose and with malice to injure Plaintiffs." (Sahaya Mot. 6.) The elements of a claim for civil conspiracy under Pennsylvania law are: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage." *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. Ct. 2008). The plaintiff must also show that

defendants acted with malice, or intent to injure. *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997). Circumstantial evidence is sufficient to sustain a civil conspiracy claim. *Baker v. Rangos*, 324 A.2d 498, 506 (Pa. Super. Ct. 1974) ("The nature of the crime attempted usually makes it susceptible of no other proof than by circumstantial evidence.") (internal quotation marks and citation omitted); *RDK Truck Sales and Serv., Inc. v. Mack Trucks, Inc.*, Civ. A. No. 04-4007, 2009 WL 1441578, at *30 (E.D. Pa. May 19, 2009).

Considering the evidence and justifiable inferences most favorable to the Berger Plaintiffs, the Court will leave the jury's civil conspiracy verdict undisturbed. Sahaya played a central role in Defendants' scheme. As the organizer of the December 6, 2006 meeting and the author of the Ram Letters, Sahaya engaged in conduct clearly intended to lure Berger to commit funds to Defendants' projects. Indeed, Sahaya does not address the fact that he attended this meeting when he claims that he could not have acted against "an unknown individual or corporate entities." (Sahaya Mot. 6.) Sahaya's motion will thus be denied as to the jury's civil conspiracy verdict.

### C. The Jury's Compensatory and Punitive Damages Awards

Sahaya argues that the jury's punitive damages award should be amended to reflect the jury's "assessing 0% liability to Sahaya." (Sahaya Mot. 7-8.) In reviewing the verdict sheet, the Court must approach the jury's responses with care; if there is "a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280, 293 (3d Cir. 1980) (quoting *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)). Thus, even a "minimally plausible" reconciliation of the jury's answers mandates preservation of the jury's verdict. *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 764-66 (3d Cir. 1990).

By answering "yes" on Questions One and Two, the jury indicated that Plaintiffs had proven Sahaya liable for fraud and civil conspiracy by clear and convincing evidence. (Document No. 253) The Berger Plaintiffs interpret the jury's finding of zero liability for compensatory damages in the context of the jury's other responses as "merely establishing the defendants' contribution rights vis-à-vis one another." (Pls.' Opp'n to Def. Mark Sahaya's Mot. to Alter the J. or for a New Tr. 8.) Adopting Sahaya's explanation that the jury instead intended to "put Sahaya in the same category as the other defendants for which no liability was found" would require the Court to overturn the jury's responses to Questions One and Two of the verdict sheet. (Sahaya Mot. 8.) Because Berger puts forth a plausible interpretation of the jury's responses, the Court rejects Sahaya's argument.

The verdict could also be interpreted as an award of zero dollars in compensatory damages. Pennsylvania law permits juries to award punitive damages without awarding compensatory damages. *Sites v. Nationstar Mortg. LLC*, 646 F. Supp. 2d 699, 713 (M.D. Pa. 2009) (citing *Rhoads v. Herberling*, 451 A.2d 1378, 1380 (Pa. Super. Ct. 1982)); *Katz v. Food Scis. Corp.*, Civ. A. No. 99-622, 2000 WL 1022986, at *6 (E.D. Pa. July 13, 2000) (citing *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 802-03 (Pa. 1989)). The verdict is thus properly left undisturbed.

### D. Sahaya's Clearly Outrageous Conduct

Sahaya seeks to amend the jury's punitive damages award on the grounds that the Berger Plaintiffs failed to prove "clearly outrageous conduct" or that Sahaya intended harm to or even knew of the Berger Plaintiffs. (Sahaya Mot. 9-10.) A defendant's conduct "must be outrageous for a jury to award punitive damages." *Hughes v. Consol-Pa. Coal Co.*, 945 F.2d 594, 616 (3d

Cir. 1991) (citing *Rizzo v. Haines*, 555 A.2d 58, 69 (Pa. 1970)).  Evidence of "the defendant's evil motive or his reckless indifference to the rights of others" may support a punitive damages award.  *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005).  The evidence of Sahaya's intentional creation of fraudulent documents and his significant role in Defendants' overall scheme, discussed above, gave the jury a record of Sahaya's "evil motive" which provided a proper basis for awarding punitive damages.  The Court thus declines to amend the judgment as to the jury's punitive damages award against Sahaya.

### E. Sahaya's Motion for a New Trial

Sahaya moves in the alternative for a new trial.  In its review of the evidence above, the Court found nothing to suggest that a miscarriage of justice would result were the verdict to stand.  Rather, it is clear that the jury had sufficient evidence to conclude that Sahaya committed fraud and participated in a civil conspiracy with his co-defendants.  Sahaya's motion for a new trial will thus be denied.

## IV. CONCLUSION

The Court will thus deny Sahaya's motion in its entirety.  An Order consistent with this Memorandum will be docketed separately.