# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BERISH BERGER, et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| RICHARD ZEGHIBE, et al., | : | No. 08-5861 |
| Defendants. | : | |

## MEMORANDUM

Schiller, J.                                                                                           October 13, 2010

Following a two-week trial, a jury found Defendants Ravinder Chawla and World Acquisition Partners Corporation liable for conspiracy to defraud Plaintiffs in connection with a series of real estate transactions. Chawla and World Acquisition Partners Corporation have filed a motion for judgment as a matter of law on Plaintiffs' civil conspiracy claim. The Court will deny their motion for the reasons discussed below.

## I. BACKGROUND

This case arises from an unmemorialized investment relationship between Berish Berger, corporate entities associated with him (collectively, the "Berger Plaintiffs"), and Defendants including Chawla and World Acquisition Partners (collectively, the "Chawla Defendants"). The Berger Plaintiffs are comprised of Berger and the following five foreign companies: Ardenlink Limited; Bergfeld Company Limited; Busystore Limited; Kilbride Investments Limited; and Towerstates Limited (collectively, the "Corporate Berger Plaintiffs"). The Berger Plaintiffs accused Chawla of conspiring to defraud Berger via "deceitful transactions in Philadelphia real estate." (Compl. ¶ 1.) According to Berger, Chawla and his co-defendants obtained $36.5 million from the Corporate Berger Plaintiffs by inducing Berger to invest in two properties in Philadelphia: a parcel

of land between JFK Boulevard and the Schuylkill River (the "River City Properties") and a five-story office building located at 2040 Market Street.

## A. The River City Properties

Chawla and co-defendant Richard Zeghibe arranged to purchase the River City Properties from R&F Penn Center Associates ("R&F Penn") for $32.5 million. (Trial Tr. 3, July 19, 2010.) Chawla was already working on selling the property himself while the R&F Penn deal was pending. (*Id.*) After repeated attempts to find a buyer for the property, Chawla and Zeghibe struck a deal with Eli Weinstein in September, 2006, to sell the River City Properties to him for $62.5 million. (*Id.* at 4.) Chawla learned from his attorney around that time that a 125-foot height limitation then under consideration by the Philadelphia City Council would substantially reduce the value of the River City Properties. (*Id.* at 4-5.)

Chawla and his partners sought investors to raise money for the deal with R&F Penn. Chawla's architect, James Rappoport, prepared a presentation which Chawla showed to potential lenders and investors as part of this effort. (*Id.* at 5.) Despite the height restriction looming on the horizon, Rappoport's presentation depicted the River City Properties as a high-rise development featuring skyscrapers fifty to sixty stories tall. (Trial Tr. 53, July 26, 2010.) On December 1, 2006, Chawla and Rappoport showed the presentation to a lender, Kennedy Funding, which subsequently lent them $20 million. (Trial Tr. 5, 70, July 19, 2010.) On December 6, 2006, they showed this presentation to Berger at Rappoport's office. (*Id.*)

Chawla and Weinstein were present at this meeting with Berger. (Trial Tr. 66-67, July 26, 2010.) As before, Rappoport's presentation featured a number of skyscrapers on the River City Properties site. (*Id.* at 53.) No one told Berger that the impending height restriction ordinance

2

would render Rappoport's plan impossible to fulfill. (*Id*. at 71-72.) Chawla then drove with Berger to visit the River City Properties in person. (Trial Tr. 77, July 19, 2010.)

Defendants continued to market the River City Properties to Berger after Berger returned to London following the December 6, 2006 meeting and site tour. Chawla had an appraisal of the River City Properties sent to Berger on December 8, 2006. (*Id*. at 19-20, 81.) This appraisal was based in part on a transaction between World Acquisition Partners Corporation ("WAP") and JFK Boulevard Acquisition Partners ("JFK BLVD"). (*Id*. at 15.) Chawla, who controls WAP, intended to use it as the vehicle to purchase the River City Properties from JFK BLVD for $50 million. (*Id*. at 7, 13.) JFK BLVD, controlled by Zeghibe, held the contract to purchase the property from R&F Penn. (*Id*. at 11.) On paper, Chawla was thus planning to purchase the site for $50 million from his own partner after they acquired the property for $32.5 million from R&F Penn. This $50 million sale was never consummated. (*Id*. at 13-14.) After the December 6, 2006 meeting, Chawla sent an appraisal of the River City Properties to Berger which referenced the $50 million contract between WAP and JFK BLVD. (*Id*. at 20.) Berger testified at trial that had he known Chawla was actually acquiring the property for $32.5 million, he would not have invested in the River City Properties. (Trial Tr. 37, July 22, 2010.)

At the time, however, the pitch was successful. On December 18, 2006, one of the Corporate Berger Plaintiffs, Kilbride Investments Limited ("Kilbride"), sent $12 million to Montgomery Abstract, a title company, for the purpose of acquiring the River City Properties from R&F Penn. (Trial Tr. 5-6, July 19, 2010.) Kilbride's $12 million was used in the closing that followed on December 21, 2006. (*Id*. at 102.) At trial, Chawla testified that he was unaware that Kilbride's money was associated with Berger. (*Id*. at 6.) Chawla said that he believed it had come from

3

Weinstein and that Weinstein had "represented that was his money." (*Id*. at 86; Trial Tr. 48, July 20, 2010.) Chawla does not now dispute, however, that Berger in fact caused that $36.5 million to be wired to the United States for use in the transactions at issue, including the $12 million sent by Kilbride to Montgomery Abstract. (Trial Tr. 8, July 20, 2010.)

### B. 2040 Market Street

Berger became interested in the 2040 Market Street project at the same December 6, 2006 meeting at which Rappoport gave his River City Properties presentation. (Trial Tr. 78, July 26, 2010.) The 2040 Market Street project involved selling the air rights above the existing five-story structure. (*Id*. at 100, 135.) Chawla and Zeghibe owned 2040 Market Street at that time through a separate entity controlled by them and their families. (Trial Tr. 80, July 19, 2010; Trial Tr. 19-20, July 20, 2010.) Chawla and Zeghibe acquired the property for $21 million. (Trial Tr. 19-20, July 20, 2010.)

Approximately one week after the December 6 meeting, Chawla's associate Mark Sahaya prepared a letter expressing the interest of "Ram Associates" in purchasing the air rights at the 2040 Market Street site for $28 million. Sahaya prepared the letter in Chawla's office, using one of Chawla's computers. (Trial Tr. 125, July 20, 2010.) The letter was dated July 21, 2006. (Trial Tr. 91, 93-95, July 19, 2010.)

Sahaya then prepared a second "Ram Associates" letter, dated December 21, 2006, in which the purported buyer increased its offer to $31 million. (Berger Pls.' Tr. Ex. 18.) Sahaya had the letter faxed "to the United Kingdom" and directed Chawla's office to "make sure you remove the fax trailer before you do so!!!" in a December 14, 2006 e-mail. (Trial Tr. 97, July 19, 2010; Berger Pls.' Tr. Ex. 116.) Berger, who resides in the United Kingdom, received this follow-up letter in

4

early January. (Trial Tr. 55, July 22, 2010.) Berger learned later that the purported air rights purchaser was a fabrication. (*Id*. at 56.)

### C. Movement of Funds Between Plaintiffs and Defendants

None of the funds at issue belonged to Berger himself; rather, the Corporate Berger Plaintiffs sent Defendants funds as follows:

- $12 million from Kilbride Investments Limited to Montgomery Abstract on December 18, 2006;
- $9.5 million from Busystore Limited to Pine Projects on December 19, 2006;
- $4 million from Towerstates Limited to Pine Projects on January 8, 2007;
- $6 million from Ardenlink Limited to Pine Projects on January 8, 2007;
- $5 million from Bergfeld Company Limited to Pine Projects on January 19, 2007.

(Defs., Ravider Chawla and World Acquisition Partners Corporation's Renewed Mot. for J. as a Matter of Law on Pls.' Civil Conspiracy Claim Pursuant to Fed. R. Civ. P. 50 [Chawla Mot.] Ex. 3, at 3.) Pine Projects is a corporate entity controlled by Weinstein. (Trial Tr. 161, July 20, 2010.) Apart from the $12 million paid to Montgomery Abstract directly, the Corporate Berger Plaintiffs' funds flowed from Pine Projects to WAP. (*Id*.)

### D. The Verdict

The jury found the Chawla Defendants liable for conspiracy and found them each 5% liable for compensatory damages of $33,000,000. The Court entered judgment against the Chawla Defendants accordingly. The jury also found Weinstein liable for fraud. (*Id*.)

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 50(b), the trial court may enter judgment

notwithstanding a jury's verdict if, "as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001). Courts review all of the evidence in the record in ruling on such motions. *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 150 (2000). "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id*. The motion should thus "be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

## III. DISCUSSION

The Chawla Defendants' argument hinges on Berger's status as an assignee of the Corporate Berger Plaintiffs. Because none of the funds sent to Defendants belonged to Berger himself, Berger was obliged to obtain assignments from the Corporate Berger Plaintiffs to establish standing in this case. The Court extensively addressed this issue in a prior opinion. *Berger v. Weinstein*, Civ. A. No. 07-994, 2008 WL 3183404 (E.D. Pa. Aug. 6, 2008), *aff'd*, 348 Fed. Appx. 751 (3d Cir. 2009). Berger's standing derives solely from these assignments. The Chawla Defendants argue that the Berger Plaintiffs must demonstrate that they acted with malice toward the Corporate Berger Plaintiffs to maintain a civil conspiracy claim because Berger stands in the Corporate Berger Plaintiffs' shoes as an assignee. (Chawla Mot. 4.)

### A. Civil Conspiracy

6

The Chawla Defendants assert that the Corporate Berger Plaintiffs "were not known to the Defendants at the time that any conspiracy to defraud is alleged to have occurred" and that it was therefore impossible for the Berger Plaintiffs to show that the Chawla Defendants acted with malice toward the Corporate Berger Plaintiffs. (*Id*. at 8.) To the contrary, a review of the record reveals that the jury had sufficient evidence of the Chawla Defendants' malice toward the Berger Plaintiffs to support a civil conspiracy verdict.

Pennsylvania law requires that plaintiffs show the following to sustain a civil conspiracy claim: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage." *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. Ct. 2008). The plaintiff must also show that defendants acted with malice, or intent to injure. *Strickland v. Univ. of Scranton*, 700 A.2d 979, 987 (Pa. Super. Ct. 1997). Circumstantial evidence is sufficient to support a civil conspiracy claim. *Baker v. Rangos*, 324 A.2d 498, 506 (Pa. Super. Ct. 1974); *RDK Truck Sales and Serv., Inc. v. Mack Trucks, Inc.*, Civ. A. No. 04-4007, 2009 WL 1441578, at *30 (E.D. Pa. May 19, 2009). As the Chawla Defendants challenge the jury's verdict only as to the element of malice, the question before the Court is whether the Berger Plaintiffs introduced sufficient evidence, including circumstantial evidence, to support the jury's conclusion that the Chawla Defendants intended to injure the Corporate Berger Plaintiffs.

**B.     The Jury Could Reasonably Conclude That Chawla Knew the Corporate Plaintiffs Were Providing Funds at Berger's Direction**

The Berger Plaintiffs presented circumstantial evidence showing that the Chawla Defendants

7

knew the Corporate Berger Plaintiffs were providing funds based on misrepresentations made to Berger. For example, the record establishes that Chawla worked to obtain Berger's participation and that his efforts resulted in Defendants obtaining the money needed to close the gap between the $20 million loan they obtained from Kennedy Funding and the $32.5 million purchase price. Although Chawla testified at trial that he did not know who was responsible for obtaining the Kilbride funds other than Weinstein, it was not unreasonable for the jury to decline to credit that testimony given the evidence that Chawla aggressively wooed Berger immediately prior to the Kilbride transfer.

Specifically, Chawla testified that he drove Berger to the site of the River City Properties following the December 6, 2006 meeting. (Trial Tr. 77, July 19, 2010.) He then followed up by sending Berger a misleading appraisal overstating the River City Properties' value based on Chawla's own arrangement with Zeghibe. (*Id*. at 19-20, 81.) It was not unreasonable for the jury to conclude that Chawla was aware that the Kilbride funds came from Berger given that Chawla and his partners received the $12 million from Kilbride a few days later.

Further, the Kilbride transfer represented only the first of five investments made by the Corporate Berger Plaintiffs at Berger's direction. As the Berger Plaintiffs observe, there was thus "ample evidence that the Chawla Defendants knew, no later than December 18, 2006 — when the $12 million was transmitted from Kilbride Investments to their title company Montgomery Abstracts [sic] — that Berger's money was not coming directly from Berger, but instead was coming from the plaintiff-companies." (Pls.' Opp'n to the Chawla Defs.' Renewed Mot. for J. as a Matter of Law on Pls.' Civil Conspiracy Claim [Berger Opp'n] 4.)

    **C.**     **It Was Reasonably Foreseeable That Berger Would Use Associated Corporate Entities to Fund His Investments**

Even assuming the Chawla Defendants were not aware of the specific identities of the

8

Corporate Berger Plaintiffs, the jury's verdict would stand because it was reasonably foreseeable that Chawla's actions would harm such outside investors. A civil conspiracy renders a conspirator liable for the foreseeable acts of co-conspirators performed to further that conspiracy. *Watson v. Borough of Darby*, Civ. A. No. 96-7182, 1997 WL 135701, at *2 (E.D. Pa. Mar. 17, 1997) (citing *Skipworth v. Lead Indus., Inc.*, 665 A.2d 1288, 1292 (Pa. Super. Ct. 1995)). Here, Chawla's co-conspirator Weinstein fraudulently misrepresented numerous aspects of the transactions involving the River City Properties and 2040 Market Street. Chawla himself assisted Weinstein in committing this underlying tort by providing misleading information to Berger.

While Chawla and Weinstein may not have communicated this information to the Corporate Berger Plaintiffs directly, the Chawla Defendants nevertheless bear liability for the foreseeable reliance of third parties on these misrepresentations. *See Woodward v. Dietrich*, 548 A.2d 301, 309 (Pa. Super. Ct. 1988) (quoting Restatement (Second) of Torts §§ 531, 533). Berger testified that it is common practice in the real estate investment community to transact business through corporations rather than individually. (Trial Tr. 11-13, July 23, 2010.) Indeed, Chawla acted through various corporate entities to conduct his affairs with respect to the River City Properties and 2040 Market Street. (Trial Tr. 7, 13, 80, July 19, 2010; Trial Tr. 19-20, July 20, 2010.) It was thus foreseeable to the Chawla Defendants that similar corporate entities acting at Berger's direction would rely on the Chawla Defendants' and their co-conspirators' misrepresentations. The jury therefore could reasonably conclude that the Chawla Defendants acted with malice toward the Corporate Berger Plaintiffs.

**IV.     CONCLUSION**

The Court will thus deny Chawla's motion. An Order consistent with this Memorandum will be docketed separately.